**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| WILLIE CLAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-02412 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ———————————— | ) | |
| | ) | |
| | ) | |
| ROETTA GRIFFIN-MARSHALL, as special | ) | |
| representative for the estate of Anthony Hall, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-02995 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ———————————— | ) | |
| | ) | |
| | ) | |
| PEPE MARTINEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-04348 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ———————————— | ) | |

| | | |
|---|---|---|
| VALANDO T. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-06066 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| JASON KUHLMANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 19-cv-06702 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| THOMAS DART, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

### MEMORANDUM OPINION AND ORDER

While detained in Division 6 of the Cook County Jail, Plaintiff Willie Clay began experiencing a toothache. Clay claims that he waited nearly a month before being evaluated by a dentist and that, as a result of the delay, he experienced unnecessary pain. For that reason, he has brought the present action pursuant to 42 U.S.C. § 1983 on behalf of himself and similarly situated Division 6 inmates against Defendants Thomas Dart, in his official capacity as the Sheriff of Cook County ("Sheriff"), and Cook County. Clay's Second Amended Complaint alleges that Division 6's dental clinic maintained grossly deficient scheduling and staffing policies that denied constitutionally adequate medical care to inmates. This Court has certified a plaintiff class consisting of similarly situated individuals assigned to Division 6 between February 19, 2018, and March 31, 2020, who submitted a written complaint of a toothache

2

causing significant pain but failed to receive a timely evaluation by a dentist. Now before the Court are Clay and Defendants' respective motions to exclude expert testimony (Dkt. Nos. 331, 334), their cross-motions for summary judgment (Dkt. Nos. 340, 343), and Defendants' motion to decertify the class (Dkt. No. 349). For the reasons that follow, Clay's motion to exclude expert testimony is granted and Defendants' motion is denied, both parties' motions for summary judgment are denied, and Defendants' motion to decertify the class is denied.

## BACKGROUND

### I.      Local Rule 56.1

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts that they contend entitle them to summary judgment. L.R. 56.1(a)(2), 56.1(d). The statement of facts "must consist of concise numbered paragraphs" and "[e]ach asserted fact must be supported by citation to the specific evidentiary material . . . that supports it." L.R. 56.1(d)(1), (2). The party opposing summary judgment must then file a response to the movant's statement. L.R. 56.1(b)(2). The response should respond to each numbered paragraph in the moving party's statement and, where the opposing party disputes a fact, it must include specific references to the affidavits, parts of the record, or other supporting materials relied on to controvert that fact. L.R. 56.1(e). "Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3). Moreover, the response "may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made." L.R. 56.1(e)(2). Nor may the response "assert legal arguments, except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." *Id.* To the extent the opposing party wishes to present any additional facts, they may do so by submitting a separate statement of additional facts that complies with Local Rule 56.1(d), which also governs the moving party's statement of material facts. L.R. 56.1(b)(3). Then, the moving

party must submit a response to those additional facts subject to the requirements for the opposing party's response to the statement of material facts set forth in Local Rule 56.1(e). L.R. 56.1(c)(2).

"The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). To that effect, "[a] litigant who denies a material fact is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion, for quick reference of the court." *Id.* But here, Defendants' responses to Clay's statement of facts in support of his motion for summary judgment and statement of additional facts in opposition to Defendants' motion for summary judgment are replete with improper argument, baseless objections, and evasive denials that make it difficult to discern those facts over which there is a genuine dispute. (*See* Defs.' Resp. to Pl.'s Statement of Facts in Supp. of Pl.'s Mot. for Summ. J. ("DRPSF"), Dkt. No. 387; Defs.' Resp. to Pl.'s Statement of Additional Facts in Opp'n to Defs.' Mot. for Summ. J. ("DRPSAF"), Dkt. No. 367.) At other times, Defendants introduce new facts well beyond the scope of the factual assertion to which they are offered in response.

All of the above flaws can be seen in Defendants' response to the following factual assertion by Clay: "On June 11, 2019, Dental Assistant [Bessie] Roddy said a dentist worked in the Division 6 dental clinic 'on two different days' during the week and that on Tuesday, Wednesday, and Thursday there was no dentist in the Division 6 dental clinic." (DRPSF ¶ 55(a).) Defendants' response begins with the objection that "[i]t is immaterial which days a dentist worked in the Division 6 dental clinic because Division 6 detainees were also seen and treated in the Division 5 dental clinic." (*Id.*) As to the materiality objection, facts bearing on the days that a

dentist was assigned to the Division 6 dental clinic are unquestionably material to one of the central issues in this case: whether that clinic was adequately staffed to provide constitutionally adequate dental care to Division 6 detainees. Moreover, Defendants' claim that it did not matter that there was not always a dentist available at the Division 6 dental clinic because detainees could be treated at the Division 5 clinic is both argumentative and introduces new facts that are better presented in Defendants' statement of additional facts. Defendants' response goes on to dispute Clay's factual assertion because "Division 6 detainees who had urgent dental conditions . . . were also seen and treated in the Division 5 dental clinic." (*Id.*) Not only is that "dispute" based on new facts, but it also fails to squarely respond to Clay's factual assertion that there was no dentist in the Division 6 dental clinic around June of 2019.

While Defendants do not always commit multiple Local Rule 56.1 violations in a single response, individual violations remain all too frequent. The Court will not exhaustively catalogue each and every one of Defendants' many responses that run afoul of Local Rule 56.1. Suffice to say, improper denials like the example above "defeat the whole point of Local Rule [56.1]—to identify just what facts are actually in dispute." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). The Court is not "required to wade through improper denials . . . in search of a genuinely disputed fact." *Id.* at 529. Where the Court is able to discern a genuine dispute of fact from Defendants' responses, such dispute will be credited. But where Defendants fail to squarely dispute one of Clay's factual assertions clearly and concisely in a way that accurately reflects the record, the Court will deem those facts as admitted. Further, the Court will not entertain any legal argument that Defendants' improperly advance in their Local Rule 56.1 responses. Likewise, it will not address any frivolous objections. Finally, the Court observes that Clay's own responses to Defendants' statement of facts are not always in perfect

compliance with Local Rule 56.1, though the issues are far less pervasive than in Defendants' submissions. The Court will handle any of Clay's responses that transgress Local Rule 56.1 in the same manner as Defendants' noncompliant responses.

## II.     Factual Background

Subject to the above considerations, the following facts are undisputed unless otherwise noted.

Willie Clay was a detainee at the Cook County Jail and was housed in Division 6 for part of the class period. Also housed in that division during the class period were Pepe Martinez, Anthony Hall, Valando Dixon, and Jason Kuhlmann, each of whom is an individual Plaintiff in one of the cases related to Clay's action that have been reassigned to this Court.[1] While housed in Division 6, Clay alleges that he experienced an objectively unreasonable delay in receiving a dental evaluation in response to his complaints of significant pain from a toothache. According to Clay, that delay in care was caused by Defendants' failure to staff Division 6's dental clinic with enough dentists to provide timely treatment for detainees with urgent dental needs and their deficient policies and procedures for scheduling appointments for such detainees.

---

[1] Defendants moved for summary judgment against the Plaintiff in each of the five above-captioned related cases. *See Hall v. Dart*, 1:19-cv-02995, Dkt. No. 109; *Martinez v. Dart*, 1:19-cv-04348, Dkt. No. 160; *Dixon v. Dart*, 1:19-cv-06066, Dkt. No. 127; *Kuhlmann v. Dart*, 1:19-cv-06702, Dkt. No. 107. In support of all the motions, Defendant rely on the arguments advanced in their briefing in support of their motion for summary judgment as to Clay. That is, Defendants make no arguments specific to the particular Plaintiffs in the related cases but instead set forth their summary judgment arguments as to all Plaintiffs in their submissions in *Clay v. Dart*, 1:19-cv-02412. For that reason, the Court addresses Defendants' motions for summary judgment in *Clay* and the related cases together in this memorandum opinion. Meanwhile, *Clay* is the only related case in which the Plaintiff has moved for summary judgment in his favor. Likewise, the motions to strike expert testimony and Defendants' motion for class decertification relate to the *Clay* case.

### A.     Requesting Dental Care

Detainees at the Cook County Jail may request dental care by submitting a health service request form ("HSRF"). (DRPSF ¶ 39; Pl.'s Resp. to Defs.' Statement of Facts in Supp. of Defs.' Mot. for Summ. J. ("PRDSF") ¶ 1, Dkt. No. 357.) Cermak Health Services ("Cermak"), the Cook County Jail's healthcare provider, maintains written guidelines for the processing of non-emergency HSRFs. (DRPSF ¶ 85; Pl.'s Resp. to Defs.' Statement of Additional Facts in Opp'n to Pl.'s Mot. for Summ. J. ("PRDSAF") ¶ 70, Dkt. No. 392.) Relevant here, the guidelines call for a nurse to review an HSRF within 24 hours of receipt. (DRPSF ¶ 86.)

The parties dispute how nurses process HSRFs complaining of dental pain. Under the applicable Cermak guidelines, a nurse should conduct a same-day assessment of a detainee who complains of a toothache and then refer him to the dental clinic for the detainee's division to schedule an appointment. (DRPSF ¶ 90; PRDSAF ¶ 35.) According to Defendants, nurses act consistent with that procedure and all detainees who submit an HSRF complaining of a toothache are taken to the dispensary where a nurse conducts a face-to-face assessment. (PRDSF ¶ 2.) Then, if indicated, the nurse will refer the detainee for an appointment with a dentist. (*Id.* ¶¶ 3–4.) On the other hand, Clay claims that the evidence shows that nurses rarely conducted face-to-face assessments of detainees who complained of a toothache and instead sent their HSRFs directly to the relevant division's dental clinic. (DRPSF ¶¶ 54, 72–73; PRDSF ¶¶ 2–4.) And while the guidelines called for nurses to scan and transmit HSRFs with complaints of dental pain to an email address for dental referrals, in practice, HSRFs were sent to the dental clinic in one of three ways: by email, by fax, or by hand delivery. (DRPSF ¶¶ 86–87.)

### B.     Scheduling Urgent HSRFs

The general practice was for detainees to be evaluated at the dental clinic for the division in which they were housed. (*Id.* ¶ 51.) Thus, HSRFs submitted by Division 6 detainees would be

7

referred to the Division 6 dental clinic. (*Id.*) At all relevant times, the Division 6 dental assistant Bessie Roddy was responsible for scheduling dental appointments for Division 6 detainees. (PRDSF ¶¶ 10–12.)

As part of her scheduling responsibilities, Roddy was tasked with reviewing HSRFs and determining whether a detainee should be scheduled for an urgent appointment based on his subjective complaint of pain indicated on the HSRF. (DRPSF ¶ 56; PRDSAF ¶¶ 40, 49.) Where a detainee indicated in his HSRF that he was experiencing a toothache causing him a pain level of 6 or greater on a 1-to-10 scale,[2] his HSRF was to be treated as urgent. (DRPSF ¶¶ 57, 90; PRDSAF ¶ 35.) Under the written guidelines, detainees with urgent complaints of pain were to be scheduled for an evaluation by a dentist within 72 hours. (DRPSF ¶ 57; PRDSF ¶ 8.) And Defendants assert that Roddy, like all Cook County Jail dental assistants, received training to that effect. (PRDSF ¶¶ 10–11; PRDSAF ¶ 49.) Yet the parties dispute whether Roddy adhered to that training, as Clay notes that Roddy testified that her practice was to classify as urgent any HSRF complaining of a toothache, regardless of how the detainee rated his pain on the 1-to-10 scale; *i.e.*, an HSRF with a toothache rated as a 1-out-of-10 would be treated as urgent just as one with a toothache rated as a 10-out-of-10. (DRPSF ¶ 71; DRPSAF ¶ 16.)

### C. Staffing of the Division 6 Dental Clinic

For most of 2018, Dr. Thomas Prozorovsky was the sole dentist working at the Division 6 dental clinic. (DRPSF ¶¶ 58–59; PRDSF ¶ 14.) He retired in December 2018. (DRPSF ¶ 59; PRDSF ¶ 14.) In the months following Dr. Prozorovsky's retirement, several other Cook County

---

[2] Although the parties' Local Rule 56.1 submissions do not include a factual assertion making this fact explicit, it has been established that HSRFs ask detainees complaining of a toothache to rate their pain level on a 1-to-10 scale. *Clay v. Dart*, No. 19-cv-02412, 2021 WL 4264244, at *1 (N.D. Ill. Sept. 20, 2021).

Jail dentists staffed the Division 6 dental clinic on a rotating basis. (PRDSAF ¶ 14.) Yet, from January 1, 2019, through October 1, 2019, there was a dentist available at the Division 6 dental clinic for only 88 of 189 of potential dentist working days. (DRPSF ¶ 68; DRPSAF ¶ 4.) Put another way, there was a dentist covering the Division 6 dental clinic only 46% of the time during this period. (*Id.*) Indeed, many weeks, there was a dentist assigned to the Division 6 dental clinic only on Mondays and Fridays. (DRPSF ¶ 55; DRPSAF ¶ 6.) It was not until Dr. Kehinde Fasanya was hired in October 2019 as the Division 6 dentist that there was again a dentist regularly available each weekday at the dental clinic. (DRPSF ¶¶ 67, 69; PRDSF ¶ 15; DRPSAF ¶¶ 7–8.)

### D. Alleged Delays in Scheduling Urgent HSRFs for Appointments

Prior to the class period, the Cook County Jail's issues with providing timely dental care for detainees attracted the attention of the U.S. Department of Justice ("DOJ"). (DRPSF ¶¶ 40–42.) Ultimately, an agreed order entered in *United States v. Cook County*, No. 10-cv-2946 (N.D. Ill.) led to the establishment of a framework to ensure detainees received timely dental care. (PRDSAF ¶¶ 69–71.) In connection with that agreed order, the DOJ set standards for the Cook County Jail's dental department that included a direction that urgent HSRFs be evaluated by a dentist within 72 hours. (DRPSF ¶ 44.) And, until 2018, the DOJ regularly monitored the Cook County Jail dental department as part of a quality improvement project. (PRDSAF ¶ 20.) Under that monitoring program, the DOJ required the dental department to collect and provide the DOJ with data on detainees' wait times following their submission of HSRFs complaining of dental pain. (DRPSF ¶ 45; PRDSAF ¶¶ 20–21.)

In May 2018, about three months after the commencement of the class period in this action, the DOJ issued a monitoring report determining that Cermak and the Cook County Jail remained in substantial compliance with the requirement that it provide detainees with timely

9

dental care and therefore terminated its monitoring. (DRPSF ¶ 45; PRDSAF ¶ 21.) The report reached that conclusion even though the wait time for urgent dental complaints was estimated to be around 7 days, which was short of the 3-business day goal. (PRDSAF ¶ 21.) With the termination of DOJ monitoring, the Cook County Jail stopped collecting data on HSRF wait times. (DRPSF ¶¶ 45, 47, 63; DRPSAF ¶ 21.)

Although Defendants deny that the Division 6 dental clinic was unable to provide timely care, Clay contends that the evidence shows that the Division 6 dental clinic was severely delayed in scheduling dentist appointments for detainees with urgent HSRFs during the class period. Around the same time that the DOJ stopped monitoring the Cook County Jail, Dr. Jorelle Alexander, the Chair of Oral Health for Cook County, emailed Dr. Prozorovsky to express concern that the Division 6 dental clinic was not timely scheduling HSRFs, noting that Dr. Prozorovsky's most recent DOJ numbers were "horrible." (DRPSF ¶ 46; DRPSAF ¶ 36.) She further stated that she had received six grievances from Division 6 detainees about unanswered HSRFs dating back to January. (DRPSF ¶ 46.) Then, in a clinical appraisal form for Roddy dated March 25, 2019, Dr. Kahina King,[3] Cermak's Chief Dentist, noted that Roddy needed improvement with scheduling patients for dental appointments. (DRPSF ¶¶ 52, 62; PRDSAF ¶ 14; DRPSAF ¶ 23.) And, in April 17, 2019, Dr. Alexander sent an email to dental staff, including Roddy, advising them that they were non-compliant for scheduling during the first quarter of 2019. (DRPSF ¶ 61.) In a May 8, 2019, email to Dr. Alexander, Dr. Maura Parker, the dentist who covered the Division 6 dental clinic for parts of April and May 2019, observed that

---

[3] Dr. King previously went by the last name Caldwell. (DRPSF ¶ 52.) For simplicity, the Court refers to her solely by the name Dr. King.

she was behind in addressing the "piles of [HSRFs]" that had built up at the Division 6 dental clinic due to an equipment failure. (DRPSF ¶¶ 100, 104.)

Clay and the related-case Plaintiffs each set forth evidence showing that they submitted urgent HSRFs during the class period but waited over 14 days to be scheduled for an appointment. On November 6, 2018, Clay submitted an HSRF complaining of a toothache causing him a pain level of 8-out-of-10. (DRPSF ¶ 105.) Roddy did not review Clay's HSRF until November 21, 2018, when she scheduled him for an urgent dentist appointment on December 3, 2018. (DRPSF ¶ 106.) At that December 3, 2018, appointment, Dr. Prozorovsky evaluated Clay and recorded him as having a "buccal enamel fracture" with "Numeric Pain Scale Pain Level: 7." (*Id.* ¶ 107.) Ultimately, a buccal filling was performed on Clay. (DRPSF ¶ 107; PRDSAF ¶¶ 51–53.)

Each of the related-case Plaintiffs experienced similar delays: Anthony Hall submitted an HSRF complaining of a toothache causing him a pain level of 8 on November 14, 2018, but was not evaluated by a dentist until December 3, 2018 (DRPSF ¶ 108); Pepe Martinez submitted an HSRF complaining of a toothache causing him a pain level of 7 on March 29, 2019, and another HSRF with a pain level of 10 on April 21, 2019, but was not evaluated by a dentist until May 8, 2019 (*id.* ¶¶ 109–16, 118, 120); Valando Dixon submitted HSRFs complaining of a toothache causing him a pain level of 10 on June 30, 2019, July 16, 2019, and August 20, 2019, and one with a pain level of 9 on August 15, 2019, but was not evaluated by a dentist until September 13, 2019 (*id.* ¶¶ 122–30); and Jason Kuhlmann submitted an HSRF complaining of a toothache causing him a pain level of 10 on August 27, 2019, but was not evaluated by a dentist until September 23, 2019 (*id.* ¶¶ 131–32.) Hall, Martinez, and Dixon each required a tooth extraction, among other things, to treat their respective toothaches. (*Id.* ¶¶ 108, 117, 130.) And Kuhlmann

11

was referred to a hospital where he received treatment for a "vestibular abscess in right maxilla, likely due to carious tooth #6, #8." (*Id.* ¶ 134.)

Because Clay contends that he and other similarly situated Division 6 detainees experienced delayed evaluations in response to their urgent HSRFs, he brought the present lawsuit on behalf of a class. In his Second Amended Complaint, Clay alleges that systemic deficiencies in the Division 6 dental clinic's staffing and scheduling policies resulted in objectively unreasonable delays in dental care for detainees suffering from significant dental pain that unnecessarily prolonged their pain, in violation of the Fourteenth Amendment. This Court subsequently certified the following plaintiff class:

> All persons assigned to Division 6 at Cook County Department of Corrections from February 19, 2018 to [March 31, 2020] who submitted a written "Health Service Request Form" complaining of a toothache rated 6 or greater and did not receive an evaluation by a dentist for at least 14 days after submitting the request.

*Clay v. Dart*, No. 19-cv-02412, 2021 WL 4264244, at *11 (N.D. Ill. Sept. 20, 2021).[4]

## DISCUSSION

Now before the Court are Clay and Defendants' respective motions to exclude the opinions of their opponent's proffered expert, the parties' cross-motions for summary judgment, and Defendants' motion to decertify the plaintiff class. The Court begins with the motions to exclude expert testimony, then turns to the motions for summary judgment, and concludes by addressing whether the class should be decertified.

---

[4] As originally certified, the class period was to run to the date of entry of judgment. However, the parties subsequently agreed that the last day of the class period would be March 31, 2020. (July 21, 2023 Joint Status Report, Dkt. No. 294.)

## I.     Motions to Exclude Expert Testimony

Defendants move to exclude the opinions proffered by Clay's expert, Dr. Anita Lockhart, and Clay, in turn, moves to strike Defendants' expert, Dr. John Dovgan. Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. "In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017) (internal quotation marks omitted). The district court's gatekeeping function requires the Court to engage in a three-step analysis before admitting expert testimony. *Id.* at 779. Specifically, it must evaluate: "(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony." *Id.* The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that the expert's testimony satisfies the *Daubert* standard. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### A. Dr. Lockhart

To support his claims that the Division 6 dental clinic failed to provide detainees with timely care for urgent dental concerns due to understaffing and deficient scheduling practices, Clay has retained Dr. Lockhart as an expert in correctional dentistry. Dr. Lockhart is a dentist who has worked as a clinical specialty consultant and dental officer with the Federal Bureau of Prisons since June 2013. She has also authored a chapter on correctional dentistry in a textbook on correctional healthcare.

While Defendants do not deny that Dr. Lockhart is qualified to offer expert testimony in this case, they nonetheless contend that her opinions must be excluded because she employed an unreliable methodology in reaching them. Even with respect to the most well-qualified of experts, a district court must also be satisfied that the expert employed a reliable methodology in reaching her conclusions. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). That assessment "is generally limited to assessing the reliability of the methodology—the framework—of the expert's analysis." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013). By contrast, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Smith*, 215 F.3d at 718.

According to Defendants, Dr. Lockhart relied on cherry-picked data to conclude that, during the class period, the Division 6 dental clinic lacked adequate staffing and appropriate scheduling procedures to ensure that detainees with urgent toothaches were timely evaluated by a dentist. Specifically, Defendants fault Dr. Lockhart's opinions for being based in substantial part on the records of a sample of 45 detainees who submitted urgent HSRFs during the class period that were selected and provided to her by class counsel. "Experts who engage in cherry-picking

14

of the evidence fail to satisfy the scientific method and *Daubert*." *Van v. Ford Motor Co.*, 332 F.R.D. 249, 269 (N.D. Ill. 2019). Such impermissible cherry-picking occurs where the expert "arbitrarily pick[s] and choose[]s among the same kind of scientific data when formulating their opinions." *In re Fluidmaster, Inc., Water Connector Components Prods. Liab. Litig.*, No. 14-cv-5696, 2017 WL 1196990, at *21 (N.D. Ill. Mar. 31, 2017).

What Defendants deride as cherry-picked data is more accurately described as a nonrandom sample of exemplar detainees. Yet whether an expert has based her opinions on a sufficiently representative sample is generally a matter that bears on the weight, not the admissibility, of those opinions. *Id.* at *30 (explaining that arguments over an "unrepresentative sample composition . . . go to weight, not admissibility"); *see also Manpower*, 732 F.3d at 809 ("Whether [the expert] selected the best data set to use, however, is a question for the jury not the judge. Assuming a rational connection between the data and the opinion . . . an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility."). Notably, Defendants' objections to Dr. Lockhart's exemplars focus on the randomness of her sample of detainees as opposed to the representativeness of the sample. Indeed, the exemplars appear to be facially representative of the class, since each is a detainee that, during the class period, submitted an HSRF complaining of pain rated at level 6 or more but waited at least 14 days before being evaluated by a dentist. Moreover, Defendants do not point to less favorable data that Dr. Lockhart's sample ignored to achieve a desired result. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, 581 F. Supp. 3d 1029, 1089 (N.D. Ill. 2022) (observing that the caselaw in which expert opinions were excluded for relying on a nonrandom sample involved circumstances "in which experts could have examined, but apparently ignored, fuller, more detailed data in favor of 'convenience' sampling or cherry-picking to achieve more favorable

15

results"); *see also Chen v. Yellen*, No. 3:14-cv-50164, 2021 WL 4192078, at *5 (N.D. Ill. Sept. 15, 2021) ("[R]eliance on a one-sided set of facts without considering potentially competing evidence is unreliable as a methodology; failure to address the other facts in evidence amounts to cherry-picking the facts and such selective use of facts fails to satisfy the scientific method and *Daubert*." (internal quotation marks omitted)). Thus, the Court concludes that Dr. Lockhart's use of a nonrandom sample is not a basis for excluding her opinions but instead is an issue to be explored on cross-examination.

Next, Defendants argue that Dr. Lockhart failed to conduct any meaningful analysis connecting her review of the exemplars' medical records to her conclusion that there were systemic deficiencies in the Division 6 dental clinic's staffing and scheduling practices that caused unreasonable delays in dental care for urgent HSRFs. Rather, Defendants assert that Dr. Lockhart simply summarized the medical records related to the exemplars' urgent HSRFs and concluded without further explanation that the exemplars' experience showed systemic deficiencies in the dental clinic's staffing and scheduling procedures.

The Court, however, disagrees that Dr. Lockhart did not connect the dots between her review of the exemplars and her overall conclusion. Dr. Lockhart's discussion of the exemplars is preceded by her extensive analysis of the Division 6 dental clinic's response to the urgent HSRFs submitted by three of the related-case Plaintiffs. In conducting that analysis, Dr. Lockhart considered the evidence of the response to each Plaintiff's urgent HSRF together with relevant evidence concerning the Division 6 dental clinic's staffing and scheduling practices. Then, drawing on her expertise in correctional dentistry, Dr. Lockhart explains how and why there was an unreasonably delayed response to the particular HSRF and how the delays experienced by each related-case Plaintiff was a product of the staffing and scheduling issues at the dental clinic.

16

Only once she explains how the three related-case Plaintiffs' respective experiences illustrate the Division 6 dental clinic's deficient staffing and scheduling policies does Dr. Lockhart turn to discuss the exemplars. And the purpose of her discussion of the exemplars is to show that the delayed responses to urgent HSRFs were not unique to the three related-case Plaintiffs but were part of a pattern that could be seen across a larger universe of urgent HSRFs. Further, Dr. Lockhart used the exemplars to quantify the delays, calculating based on the records of the exemplars and the three related-case Plaintiffs that Division 6 detainees waited an average of 40 days after submitting an urgent HSRF to be evaluated by a dentist. Viewed in the overall context of her report, it is readily apparent that Dr. Lockhart is using the exemplars to support her opinion that the alleged deficiencies in this case were systemic and caused an injury to the entire class.

Finally, Defendants argue that Dr. Lockhart's opinions should be excluded because she is admittedly unable to identify the exact reason why any specific Plaintiff or exemplar was scheduled for a dentist's appointment on a particular date. But it is enough that Dr. Lockhart offers well-founded opinions about the existence of systemic delays in scheduling urgent HSRFs at the Division 6 dental clinic; her opinions are not rendered inadmissible because she cannot assign a specific cause of delay for each detainee that she examined. *See, e.g.*, *Gayton v. McCoy*, 593 F.3d 610, 619 (7th Cir. 2010) ("[A]n expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome."); *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir. 1993) ("[A]n expert's lack of absolute certainty goes to the weight of [her] testimony, not to its admissibility." (internal quotation marks omitted)). Because Defendants cannot show that any of Dr. Lockhart's opinions

17

are unreliable and provide no other basis for excluding them, their motion to bar Dr. Lockhart's expert opinions is denied.

### B. Dr. Dovgan

Defendants have proffered Dr. Dovgan as an expert witness to opine on the dental standard of care. Dr. Dovgan is a practicing dentist and serves as the chief investigator for the Arizona State Board of Dental Examiners. While Clay does not challenge Dr. Dovgan's qualifications to testify as an expert in this case, he argues that there are multiple other issues that warrant excluding him as an expert. The Court agrees that Dovgan's opinions must be excluded because they are both irrelevant and unreliable.

In determining whether an expert's testimony is relevant, "the district court must consider whether the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith*, 215 F.3d at 718. "To do so, the testimony must fit the issue to which the expert is testifying and be tied to the facts of the case." *Owens v. Auxilium Pharms., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018) (internal quotation marks omitted). In this case, the central issues relate to whether the Division 6 dental clinic was adequately staffed, whether it maintained adequate scheduling procedures, and whether detainees with urgent complaints of pain from a toothache were timely scheduled for an appointment with a dentist. Yet Dr. Dovgan arrives at his opinions concerning the objective reasonableness of care that detainees received at the Division 6 dental clinic without squarely confronting any of those issues. Indeed, Dr. Dovgan concededly conducted no analysis of the staffing levels at the dental clinic and dismissed as irrelevant evidence related to the delegation of scheduling responsibilities to the Division 6 dental assistant, Roddy—at his first deposition, Dovgan could not even name the Division 6 dental assistant. (Pl.'s Mot. to Exclude Expert Testimony, Ex. 2, Dec. 8, 2023 Dovgan Dep. Tr. 35:24–40:10, 149:25–151:11, Dkt. No. 331-2.) Nor did Dr. Dovgan calculate an average time Division 6

detainees waited for a dentist's appointment after submitting an HSRF with a pain level of 6 or greater despite having the data to do so. (Pl.'s Mot. to Exclude Expert Testimony, Ex. 3, Mar. 29, 2024 Dovgan Dep. Tr. 354:2–356:6, Dkt. No. 331-3.)

Instead of directly confronting Clay's core contentions about staffing, scheduling, and the timeliness of dental evaluations, Dr. Dovgan's approach focuses on the ultimate issue of whether Division 6 detainees overall received objectively reasonable care. And, upon answering that question in the affirmative, he concludes that there could not have been any systemic deficiencies at the Division 6 dental clinic that impeded detainees' access to timely care. Perhaps such a working-backwards approach might be acceptable depending on how it is applied. The problem here is that Dr. Dovgan fails to apply his methodology for assessing the reasonableness of dental care to the relevant facts in this case.

To evaluate the quality of dental care that detainees received, Dr. Dovgan reviewed the treatment records from the class period for Clay and the related-case Plaintiffs along with a random sample of 84 detainees. To put together the sample, Dr. Dovgan selected the first complete name on every 25th page of the Division 6 dental clinic's schedule for the class period. However, that process resulted in a detainee being selected for the sample regardless of whether he had submitted an HSRF indicating a pain level of 6 or greater. Thus, Dr. Dovgan's sample sweeps in not just detainees with urgent HSRFs but also detainees whose HSRFs indicated conditions causing them no pain or requested routine procedures like a cleaning. Put another way, the sample is flawed because it is not limited to actual or potential members of the class. "[W]hether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself." *Owens*, 895 F.3d at 973; *cf. Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030 (N.D. Ill. 2003) ("For a survey to be

properly designed . . . a sample that accurately represents the target population must be selected . . . .”). And this case concerns whether detainees with urgent complaints of pain from a toothache received a reasonably timely response from a dentist. Detainees who never submitted an urgent HSRF have no relevance to the reasonableness of care provided in response to urgent HSRFs. Dr. Dovgan's analysis of a sample that includes those detainees provides an answer to a different question than the one asked and, as such, does not assist the trier of fact.

Another significant problem with Dr. Dovgan's testimony is that, in instances where a detainee has complained of urgent pain, Dr. Dovgan offers his own opinion on whether that detainee was, in fact, suffering pain at the level indicated, and then he incorporates that credibility determination into his evaluation of the reasonableness of care the detainee received. However, it is well-established that "[a]n expert may not tell the jury whom to believe, nor can he make credibility determinations." *Sommerfield v. City of Chicago*, 254 F.R.D. 317, 330 (N.D. Ill. 2008); *see also Heard v. Ill. Dep't of Corrs.*, No. 06 C 0644, 2012 WL 2524748, at *4 (N.D. Ill. June 29, 2012) (holding that the proffered medical expert could "not testify that, based on his expert opinion, [the plaintiff] suffered pain"). And Dr. Dovgan has previously been admonished against opining to a jury whether a detainee's "pain was severe enough to rise to the level of a serious need." *Smego v. Mitchell*, No. 08-CV-3142, 2015 WL 728550, at *1 (C.D. Ill. Feb. 20, 2015).[5]

---

[5] To be clear, the Court does not suggest that an expert witness cannot testify that a particular medical condition is not associated with a significant degree of pain. *See Heard*, 2012 WL 2524748, at *4 ("[Expert] can state . . . that the medical treatments [the plaintiff] received are consistent with an individual who is suffering of pain."). The problem here involves Dr. Dovgan opining that a detainee with a documented dental condition could not have been suffering significant pain from that condition because his complaint was not supported by other objective findings such as increased blood pressure.

Not only is it improper for Dr. Dovgan to opine on the truthfulness of any detainee's subjective complaint of pain, the Court further notes that the methodology underlying his credibility determinations raise broader reliability concerns. Early in his report, Dr. Dovgan asserts that "[m]ost of the time the detainee marks pain that is a 6 or higher simply because they want to be seen quickly." (Dovgan Report at 15, 34, Dkt. No. 333-1.) That opinion is *ipse dixit*. *E.g.*, *O'Connor v. Ford Motor Co.*, No. 19-cv-5045, 2025 WL 790240, at *8 (N.D. Ill. Mar. 12, 2025) ("An expert's *ipse dixit* is inadmissible because 'an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.'" (quoting *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791 (7th Cir. 2008))). Yet it appears that unfounded opinion forms the baseline assumption of his methodology, such that he views any detainee's complaint of pain as inherently suspect. *See In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, No. 11 C 5468, 2015 WL 5050214, at *7 (N.D. Ill. Aug. 25, 2015) ("Reliability analysis under *Daubert* calls for the court to determine whether the expert's testimony is based on reliable methods rather than on his 'own subjective experience or bias.'" (quoting *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 775 (7th Cir. 2014))).

Then, in determining whether a detainee was truly experiencing the pain of which he complained, Dr. Dovgan explains that "[p]atients who have true pain are easily recognizable" because, among other things, their "blood pressure will be 20% above their baseline." (Dovgan Report at 41.) The notion that subjective complaints of pain can be objectively verified is contrary to the well-recognized understanding that "pain is subjective and affects people in different ways," thus making it "difficult to determine how much pain is present and how great its effects are." *Lawrence v. United States*, No. 18 C 1570, 2022 WL 2208851, at *2 (N.D. Ill. June 21, 2022); *see also Anderson v. Hartford Life & Accident Ins. Co.*, No. 2:08-cv-471-WTL-

21

WGH, 2010 WL 3703037, at *7 (S.D Ind. Sept. 10, 2010) ("[T]here is no scientific test to quantify pain."). It is therefore established in the Social Security Disability Insurance context that claims of pain cannot be discounted simply because they "are unsupported by significant physical and diagnostic examination results." *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014). That logic applies with similar force in the context of Dr. Dovgan's expert testimony.

The lack of scientific grounding behind Dr. Dovgan's pain evaluations raises real questions about the reliability of his overall opinion that the Division 6 dental clinic was providing objectively reasonable care. *See Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 819 (7th Cir. 2010) ("[E]xpert testimony that is not scientifically reliable should not be admitted . . . ."). That is to say, Dr. Dovgan's reliance on the scientifically ungrounded premise that credits only those subjective complaints of pain accompanied by objective support, such as increased blood pressure, suggests that he artificially discounted the urgency of a substantial number of detainees' dental issues. And if Dr. Dovgan did not have an accurate view of the dental needs of Division 6 detainees with urgent complaints of pain, that renders suspect his opinion that they were receiving adequate dental care. Finally, the unreliability of Dr. Dovgan's opinions can be seen in the multiple instances where he brushes aside a detainee's experience as an "outlier" when confronted with facts that preclude him from discrediting the urgency of the detainee's complaint of pain. (DRPSF ¶¶ 136, 140, 145, 149.)

In short, the Court finds that Dr. Dovgan's opinions must be excluded in their entirety because they do not fit the relevant facts of this case, make improper assertions regarding the credibility of detainees' subjective complaints of pain, and are not founded on scientifically reliable premises. Accordingly, the Court grants Clay's motion to exclude Dr. Dovgan's expert testimony.

## II.    Motions for Summary Judgment

Summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Here, Clay and Defendants each seek summary judgment on all or part of Clay's § 1983 claim. In evaluating cross-motions for summary judgment, the Court must take "the facts in the light most favorable to the non-movant, first for one side and then for the other." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Loc. Union 150*, 335 F.3d 643, 648 (7th Cir. 2003).

Clay has asserted a single § 1983 claim against Defendants pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). "Under *Monell*, a municipal governmental entity like the office of the Sheriff 'may be found liable under § 1983 when it violates constitutional rights via an official policy or custom.'" *Jackson v. Dart*, No. 19 C 1907, 2023 WL 130481, at *4 (N.D. Ill. Jan. 9, 2023) (quoting *Wragg v. Village of Thornton*, 604 F.3d 464, 467 (7th Cir. 2010)). To succeed on a *Monell* claim, a plaintiff must prove the following three elements: "(1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). Defendants contend that they are entitled to summary judgment because Clay fails to introduce evidence from which a jury could conclude that Defendants knew that the Division 6 dental clinic's staffing and scheduling policies resulted in detainees receiving constitutionally inadequate care.

23

On the other hand, Clay argues that the Court should enter partial summary in his favor on liability. Specifically, Clay asks that the Court enter a judgment as the following two issues: (1) that the Division 6 dental clinic lacked adequate staffing to provide constitutionally adequate dental care to detainees between January 1, 2019, and October 22, 2019 (*i.e.*, the dates during which there was no fulltime dentist assigned to the Division 6 dental clinic); and (2) that systemic deficiencies in the practice of delegating scheduling responsibilities to the Division 6 dental assistant and related procedures resulted in constitutionally unreasonable delays in scheduling urgent HSRFs throughout the class period.

### A. Clay's Motion

While Clay asks that the Court rule as a matter of law that Defendants maintained deficient staffing and scheduling policies that denied him and the class access to constitutionally adequate care, the Court is unable to reach any of his arguments for summary judgment because his motion fails even to address the essential threshold element of a *Monell* claim. As with any § 1983 claim, the first step of a *Monell* claim requires that a plaintiff prove that he was deprived of a federal right. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021). Here, as pretrial detainees challenging the adequacy of medical care that they received at the Cook County Jail, Clay and the class's constitutional claims arise under the Fourteenth Amendment's Due Process Clause. *Scott v. Dart*, 99 F.4th 1076, 1089 (7th Cir. 2024).

To establish a violation of his rights under the Fourteenth Amendment, Clay has the burden of showing that Defendants (1) "acted purposefully, knowingly, or recklessly when considering the consequences of [their] response to the medical condition at issue in the case" and (2) "that the challenged conduct was objectively unreasonable in light of the totality of the relevant facts and circumstances." *James v. Hale*, 959 F.3d 307, 318 (7th Cir. 2020). For Clay to

prove that he received objectively unreasonable medical care as a matter of law, he must demonstrate that there is no genuine dispute of material fact that "he suffered from an objectively serious medical condition" and that "the medical staff's response to it was objectively unreasonable." *Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). "A delay in medical treatment may be objectively unreasonable if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Scott*, 99 F.4th at 1089 (internal quotation marks omitted).

Clay's summary judgment motion contains no argument that he or any related-case Plaintiff received objectively unreasonable dental care as a matter of law and instead skips straight to arguing the *Monell* elements. However, "[a] *Monell* plaintiff must establish that he suffered a deprivation of a federal right **before** municipal fault, deliberate indifference, and causation come into play." *LaPorta*, 988 F.3d at 987. In the summary judgment context, that means that the existence of a genuine dispute of material fact regarding the alleged constitutional violation precludes the Court from ruling as a matter of law on Defendants' liability under *Monell*. *Ratlieff v. City of Fort Lauderdale*, 748 F. Supp. 3d 1202, 1262 (S.D. Fla. 2024) ("In the § 1983 context, a plaintiff must first establish that there is no genuine dispute of material fact as to the underlying constitutional violation before a court can grant summary judgment in plaintiff's favor as to *Monell* liability."); *Ratcliff v. City of Detroit*, No. 2:19-cv-13458, 2021 WL 3032537, at *5 (E.D. Mich. July 19, 2021) ("Because there is a genuine dispute of material fact regarding whether a constitutional violation occurred under the claim, the Court must also deny summary judgment on the *Monell* claim as to the claim."). Consequently, Clay's failure to prove a constitutional violation as to himself is fatal to the arguments he does advance in favor of summary judgment, and his motion must be denied.[6]

---

[6] Notably, Defendants' opposition does not raise Clay's failure to prove an underlying constitutional violation as a basis for denying him summary judgment. Still, Defendants as nonmovants did not have to

### B.    Defendants' Motion[7]

For their part, Defendants argue that they are entitled to summary judgment on the *Monell* claim because Clay has no evidence suggesting that there were any systemwide deficiencies at the Division 6 dental clinic that resulted in detainees receiving constitutionally inadequate dental care. Defendants further contend that Clay has no evidence from which a jury could conclude that they were deliberately indifferent to the supposed constitutional violations. Finally, Defendants claim that Clay fails to create a genuine dispute of fact as to the existence of a classwide injury. The Court begins by addressing whether there is evidence creating a dispute of fact as to whether each alleged systemic deficiency caused objectively unreasonable delays in care, then considers Defendants' deliberate indifference, and concludes by addressing the classwide-injury issue.[8]

### 1.    *Systemic Deficiencies Causing Delayed Care*

One way to prove municipal action under *Monell* is by showing the existence of "a governmental practice or custom that, although not officially authorized, is widespread and well settled." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). The Seventh

---

address the issue to defeat summary judgment since Clay failed to discharge his initial burden on an essential element of his claim. *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir. 2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").

[7] Section II.B of this Memorandum Opinion and Order addresses Defendants' arguments for summary judgment as to Plaintiffs in all five related cases. For ease of reference, the Court refers only to Clay as the Plaintiff responding to Defendants' request for summary judgment. However, the Court's discussion of Defendants' arguments applies equally to all five individual Plaintiffs.

[8] Like Clay, Defendants raise no challenge concerning Clay or the related-case Plaintiffs' proof on the alleged underlying constitutional violations. But whereas a plaintiff cannot obtain summary judgment on his *Monell* claim without first proving an underlying constitutional violation as a matter of law, "the reverse does not hold," and a defendant can obtain summary judgment in its favor "on *Monell* liability if [the plaintiff] is unable to demonstrate a genuine dispute of material fact as to one or more of the elements underlying [his] *Monell* claim[]." *Ratlieff*, 748 F. Supp. 3d at 1262.

26

Circuit has "not adopted bright-line rules regarding the quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). At the same time, it has emphasized that the evidence must be enough to show "that there is a true municipal . . . policy at issue, not a random event." *Id.* (internal quotation marks omitted); *see also Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (explaining that a plaintiff must show that the alleged widespread "practice was so pervasive that acquiescence on the part of policy makers was apparent and amounted to a policy decision" (internal quotation marks omitted)). "This may take the form of an implicit policy or a gap in expressed policies . . . ." *Thomas*, 604 F.3d at 303.

In cases challenging the adequacy of medical care provided in a correctional facility, a plaintiff can make the requisite showing through proof by which "a trier of fact could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system." *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (internal quotation marks omitted). The plaintiff must then show that those systemic deficiencies were the "moving force" behind his alleged constitutional injury. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). "This rigorous causation standard requires a direct causal link between the challenged municipal action and the violation of the plaintiff's constitutional rights." *Id.* (internal quotation marks omitted).

*a.*      *Staffing*

Defendants assert that there is no genuine dispute of fact that the Division 6 dental clinic was adequately staffed to meet detainees' needs during the class period. The Court, however, finds that Clay has introduced sufficient evidence from which a jury could conclude that the

27

Division 6 dental clinic did not have enough dentists on staff to provide timely and constitutionally adequate dental care for detainees experiencing urgent toothaches.

During the initial months of the class period when Dr. Prozorovsky was serving as the dental clinic's single, full-time dentist, he was not meeting the Cook County Jail's expectation that a dentist see at least 2,000 patients a year. (PRDSF ¶ 14; DRPSAF ¶¶ 1, 3, 5.) Moreover, throughout the class period, there were an average of 903 detainees in Division 6. (DRPSAF ¶ 9.) Yet Clay points to evidence of a consensus in the correctional dentistry field recommending that jails like the Cook County Jail maintain an "inmate to dentist ratio [of] 850:1." (*Id.* ¶ 14.)[9] Thus, even with one full-time dentist assigned to the Division 6 dental clinic, the detainee-to-dentist ratio exceeded the recommended ratio.

At the time that Dr. Prozorovsky retired in December 2019, he acknowledged that he had "a pretty full schedule most of the time" and, given the dental needs of the detainee population, "there was always something to do." (PRDSF ¶ 14; DRPSAF ¶ 1.) Nonetheless, between January 1, 2019, and October 1, 2019, there was not a dentist assigned to the Division 6 dental clinic who was available for patient visits on every working weekday. (DRPSAF ¶¶ 4–6.) Instead, a rotating cast of dentists from other Cook County Jail divisions pitched in to provide coverage, but that

---

[9] To support claims regarding the dental standard in the correctional context, Clay cites two treatises. Defendants object that Clay's factual assertions supported solely by treatise evidence cannot be considered on summary judgment because those treatise statements do not fall within the exception set forth at Federal Rule of Evidence 803(18) and are therefore inadmissible hearsay. In particular, Rule 803(18) provides an exception to the rule against hearsay for statements contained in a treatise only if "the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination," and the treatise is shown to be reliable either through expert testimony or by judicial notice. Fed. R. Evid. 803(18). The Court overrules Defendants' objections because Clay's expert Dr. Lockhart testified that she relied on the challenged treatise statements, and therefore those statements can be admitted at trial through her expert testimony. (Defs.' Mot. to Bar Expert Opinions, Ex. C, Lockhart Dep. Tr. 190:12–195:16, Dkt. No. 334-3); *e.g., Smith v. City of Chicago*, 785 F. Supp. 3d 356, 370 (N.D. Ill. 2025) ("[W]here the parties dispute the admissibility of certain evidence, the court may nonetheless consider such evidence where there exists a theory under which the evidence could be admissible at trial.").

arrangement was only able to provide the Division 6 dental clinic coverage for 46% of potential working days. (PRDSF ¶ 14, 16; DRPSAF ¶¶ 4–6) There is no evidence suggesting that the Division 6 detainees' dental needs decreased from the period when Dr. Prozorovsky was already falling short of expectations and the clinic's dental assistant, Roddy, stated her belief that access to care would improve if a dentist was available to cover the clinic each working day of the week. (DRPSAF ¶ 6.) It is also the position of Clay's expert, Dr. Lockhart, that the Division 6 dental clinic lacked sufficient dentist availability to address detainees' dental needs during this period. (DRPSF ¶ 68.)

It was not until Dr. Fasanya began working as the Division 6 dental clinic's full-time dentist in late October 2019 that access to care began meeting the Cook County Jail's expectations. (PRDSF ¶ 15; DRPSAF ¶ 8.) Dr. Fasanya's experience serves to rebut Defendants' contention that the rotating-dentist arrangement and the availability of dental care in other division clinics was sufficient to provide timely care to detainees. Specifically, Dr. Fasanya's claim that he spends 99% of his time in the Division 6 dental clinic tends to suggest that the clinic needed to be staffed by a fulltime dentist and also supports a reasonable inference that the dentists in other division clinics were similarly occupied with the needs of the detainees in their assigned division and lacked the capacity to take on additional responsibilities with respect to detainees from outside their assigned division. (DRPSAF ¶ 7.) Bolstering such an inference is Dr. King's testimony that she was able to devote little time to her administrative duties as Cermak's Chief Dentist because staff shortages required her to spend most of her time in the clinic treating patients. (*Id.* ¶ 23.)

Altogether, there is enough evidence as to the insufficient availability of dentists at the Division 6 dental clinic to support Clay's claim of systemic staffing deficiencies at the clinic.

29

The Court further finds that there is evidence tying understaffing to the alleged constitutional violation—that the understaffing caused Division 6 detainees to experience objectively unreasonable delays in care that unnecessarily prolonged their urgent dental pain. It is generally understood in the field of correctional dentistry that inadequate staffing is frequently the reason for untimely care. (*Id.* ¶ 15.) And there is evidence showing that numerous Division 6 detainees who submitted urgent HSRFs were not scheduled for a dentist appointment within three days consistent with Cermak policy and the applicable standard of care, but instead, particularly during the period when there was no full-time dentist assigned to Division 6, those detainees often had to wait 14 days or more before they could visit with a dentist. (DRPSF ¶¶ 35–36, 38, 57. *See generally* Pl.'s Opp'n to Defs.' Mot. for Summ. J. at 4–5, Dkt. No. 360 (compiling a chart of thirteen Plaintiffs and exemplars showing the date they submitted an HSRF complaining of urgent pain, their dental appointment date, and the dentist's diagnosis).) Dr. Lockhart similarly opined that her review of the Plaintiffs and exemplars revealed an average wait time of 40 days between the submission of an urgent HSRF and the date that the detainee finally received an initial dentist's appointment. (DRPSF ¶ 156.) From all this evidence, the Court believes that a reasonable jury could find that the systemic deficiencies in staffing the Division 6 dental clinic were causing the alleged constitutional injury: unreasonable delays in care for urgent dental pain.

### b. Scheduling

In addition to understaffing, Clay asserts that the practice of delegating scheduling responsibilities to the dental assistant Roddy was a source of delay in arranging dental

evaluations for detainees with urgent complaints of pain.[10] While Defendants highlight the observation by another court in this District that the Cook County Jail's policy of delegating scheduling of dental appointments to a dental assistant is not facially unconstitutional, they fail to mention that the district court went on to recognize that "an issue arises when the Jail knows that the delegation means that inmates are not receiving medical care that passes constitutional muster." *Harvey v. Dart*, No. 19-cv-2996, 2021 WL 4264312, at \*5–6 (N.D. Ill. Sept. 20, 2021). Here, there is evidence to support Clay's claim that Roddy was not properly trained or qualified to review and prioritize HSRFs with complaints of urgent pain and to ensure that the detainee received a reasonably prompt evaluation by a dentist.

As Clay emphasizes, there is evidence tending to show that Roddy did not understand which HSRFs should be prioritized for an urgent dental appointment. Although Defendants claim that dental assistants are trained and qualified to prioritize detainees for appointments

---

[10] In their opposition to Clay's motion for summary judgment, Defendants assert that Clay impermissibly broadens the scope of the scheduling claim pleaded in the Second Amended Complaint by arguing deficiencies in scheduling procedures other than the delegation of scheduling responsibilities to the dental assistant. Unlike legal theories, a plaintiff does "have to raise factual allegations in their complaint[]," such that "[a]n attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). But the Court disagrees that Clay is attempting to broaden his scheduling claim beyond what he pleaded in the Second Amended Complaint. Rather, his Second Amended Complaint alleges that "there have been systemic deficiencies with the scheduling of inmates for dental appointments" and that "scheduling practices, particularly delegating scheduling decisions to dental assistants, are a barrier to timely care." (Second Am. Compl. ¶¶ 20–21, Dkt. No. 55.) Thus, the Second Amended Complaint pleads a challenge related to systemic deficiencies with scheduling practices generally, and identifies the delegation of scheduling responsibilities to the dental assistant as one particular, but not necessarily exclusive, example of those deficiencies. With the identification of the general deficiency, Defendants had notice that all aspects of the scheduling process were fair game. *See, e.g.*, *Kostovetsky v. Ambit Energy Holdings, LLC*, 242 F. Supp. 3d 708, 719 (N.D. Ill. 2017) ("[A] plaintiff has latitude to refine and develop his legal and factual theories based on the record that emerges in discovery."). In any case, the additional scheduling issues Clay raises in his summary judgment motion are all closely related to the delegation of scheduling responsibilities to Roddy, such as the procedures for transmitting HSRFs to the dental clinic and the absence of written policies for dental assistants to follow in scheduling of urgent dental appointments. As such, the Court finds that evidence of those other practices and procedures are properly considered as reflective of the deficiencies in the delegation itself.

31

based on the information contained in their HSRFs (PRDSF ¶¶ 10–11; PRDSAF ¶ 49), Clay points to evidence that, in practice, Roddy did not fully comply with Cermak's guidelines for scheduling urgent HSRFs. Specifically, Clay notes that Roddy testified that she would schedule any HSRF claiming pain for an urgent appointment, even though only pain rated 6 or greater should have been prioritized as urgent. (DRPSAF ¶¶ 16–17.) There is also testimony from the Chief Dentist, Dr. King, that dental assistants were not qualified to review and prioritize appointments for HSRFs because "that's not their job" and "[t]hey should not be diagnosing." (*Id.* ¶ 19.) Dr. Lockhart opined that, in the abstract, a dental assistant could be tasked with scheduling responsibilities, provided that they are given a "very tight written policy of expectations and parameters for which they operate within," but Roddy was provided no such guidance and therefore was not qualified to schedule detainees. (DRPSF ¶ 157; DRPSAF ¶ 27.) Clay further notes that there were issues in transmitting HSRFs for Roddy's review in the first instance. For example, in May 2018, Roddy complained that "medical across the hall [was] taking forever to get them the HSRFs with no organized system in place." (DRPSAF ¶ 20.) And a dental assistant in a different division's dental clinic testified that the email system for transmitting HSRFs to the appropriate dental clinic did not work properly. (*Id.* ¶ 21.)

The Court has addressed above the evidence showing that Division 6 detainees who submitted urgent HSRFs often had to wait over two weeks before seeing a dentist. That the practice of delegating scheduling responsibilities to Roddy contributed to delays in scheduling urgent HSRFs for appointments can be seen in the March 2019 appraisal in which Roddy was deemed in need of improvement in the area of scheduling and the April 2019 email finding Roddy noncompliant with scheduling for the first quarter of that year. (DRPSF ¶¶ 61–62.) Moreover, the dentist who briefly covered the Division 6 dental clinic noted in May 2019 that

32

there was a significant backlog of unaddressed HSRFs that they were working through at the time. (*Id.* ¶ 100.)

Consider the evidence as to Clay. On November 6, 2018, he submitted an HSRF complaining of pain that he rated at a level 8. (*Id.* ¶ 105.) That HSRF was paper triaged by a nurse on that date, but it took until November 21, 2018, for Roddy to actually schedule Clay for a dentist appointment, and even then, the appointment was scheduled for December 3, 2018. (*Id.* ¶¶ 105–06.) Notably, Roddy later looked back at Clay's HSRF and understood that it should be scheduled for an urgent appointment even though she had not selected a date within three days of November 21, 2018. (*Id.* ¶ 106.) A similar pattern in which one or both of delays in delivering an urgent HSRF to the Division 6 dental clinic and Roddy's failure to schedule a detainee for an appointment within three days of her receipt of an urgent HSRF resulted in untimely care for urgent complaints of pain. (*Id.* ¶¶ 118–19, 121, 131–32, 137–42, 150–55.)

Overall, the Court finds the above evidence sufficient to create a genuine issue of fact as to whether practices and procedures around the delegation of scheduling duties to Roddy were a moving force behind the alleged unconstitutional delays in care. The Court notes that its conclusion is in accord with that of another court in this District that considered some of the same evidence as here in a similar challenge to the Cook County Jail's policy of delegating scheduling responsibilities to dental assistants. *Bailey v. Dart*, No. 21 CV 3196, 2023 WL 6388039, at *11–14 (N.D. Ill. Sept. 29, 2023).

### 2.    *Deliberate Indifference*

To the extent Clay has evidence of systemic deficiencies causing delayed dental care for Division 6 detainees, Defendants nonetheless assert that he fails to adduce evidence that Defendants were deliberately indifferent to the risk that their policies would lead to the alleged constitutional violations. Even where there are systemic deficiencies afflicting a jail's healthcare

33

system, "a *Monell* claim can prevail only if a policy-making official knows about them and fails to correct them." *Dixon*, 819 F.3d at 348.

Although Defendants spend a considerable amount of time arguing that Clay has failed to identify the relevant policymaker who acted with deliberate indifference, it is well-established that the Sheriff, in his official capacity, "has final policymaking authority over jail operations and the provision of medical services to detainees." *Parish v. Sheriff of Cook Cnty.*, No. 07 C 4369, 2019 WL 2297464, at *9 (N.D. Ill. May 30, 2019); *see also Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016) ("Sheriff Dart . . . is a relevant policymaker for health care for [Cook County] Jail inmates . . . ."). While Clay names Cook County as a Defendant as well, that is only because Cook County "is required by statute to fund the Sheriff's expenses, including any judgments entered against the Sheriff in his official capacity," such that it is "an indispensable party in this limited capacity." *Parish*, 2019 WL 2297464, at *9. Accordingly, the Court's analysis focuses on the Sheriff's deliberate indifference.

Here, Clay's *Monell* challenge is directed to the Sheriff's failure to correct deficiencies in staffing and scheduling practices that were causing unreasonable delays in addressing Division 6 detainees' urgent complaints of dental pain. A municipality's "policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." *Connick v. Thompson*, 563 U.S. 51, 61–62 (2011) (internal quotation marks omitted); *see also Thomas*, 604 F.3d at 303 ("[I]n situations where rules or regulations are required to remedy a potentially dangerous practice, the [municipality's] failure to make a policy is also actionable."). In cases of municipal inaction, "[d]emonstrating . . . notice is essential to an ultimate finding and requires a 'known or obvious' risk that constitutional violations will occur." *J.K.J. v. Polk County*, 960 F.3d 367, 379 (7th Cir.

34

2020) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997)). If the municipality is "faced with actual or constructive knowledge that its agents will probably violate constitutional rights, it may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (internal quotation marks omitted).

Relevant here, one way to establish notice is through "proof of a prior pattern of similar constitutional violations." *J.K.J.*, 960 F.3d at 380. Even before the beginning of the class period, the Cook County Jail's delayed provision of dental care led to the agreed order in the DOJ litigation. (DRPSF ¶ 40; PRDSAF ¶ 71.) In connection with that agreed order, the DOJ required the Cook County Jail's dental department regularly to submit information concerning its timely delivery of care. (DRPSF ¶ 45.) Although the DOJ ended its monitoring of the Cook County Jail near the beginning of the class period, the DOJ noted that the 7-day wait time for urgent HSRFs still fell short of the 3-day goal. (PRDSAF ¶ 21.) There is evidence from around the same time that the Division 6 dental clinic was particularly lagging in timely scheduling HSRFs, with Dr. Alexander describing its "DOJ numbers [as] horrible" and observing an increase in "grievance" related to its delays. (DRPSF ¶ 46.) Despite the fact that the dental department had not fully resolved its timeliness concerns and the Division 6 dental clinic's particularly poor performance, the Cook County Jail ceased its tracking of HSRF wait times as soon as the DOJ ended its monitoring. (DRPSF ¶ 45; DRPSAF ¶ 20–21.) From that point on, the dental department had no access to data that would provide insight into HSRF wait times. (DRPSF ¶¶ 47, 63.)

Thus, at the outset of the class period, Defendants' history with the DOJ gave it notice that the Cook County Jail dental department's failure to provide timely dental care presented a serious risk of constitutional violations. *Daniel*, 833 F.3d at 735–36 (finding that materials related to the DOJ's investigation of health care in the Cook County Jail were cognizable

35

evidence of the Sheriff's notice of the deficiencies described therein when considered together with substantive evidence of those deficiencies). That the Sheriff stopped tracking HSRF wait times altogether as soon as the DOJ's monitoring ended might lead a reasonable jury to conclude that the Sheriff consciously adopted a policy of inaction, particularly since there remained lingering concerns as to the dental department's ability to ensure detainees' timely access to care. *See, e.g.*, *Dean*, 18 F.4th at 237 ("Regardless of the exact form of proof, the question is always whether the municipal policy reflects a conscious disregard for a known or obvious risk of the constitutional deprivation.").

Defendants claim that the Sheriff was justified in relying on the DOJ's framework to ensure that detainees' dental concerns continued to be timely addressed post-monitoring. The Sheriff also gave testimony emphasizing that the grievance process was available to address any remaining issues as to the constitutional adequacy of dental care moving forward. (DRPSAF ¶ 31.) Yet a jury could conclude that the grievance procedure should have alerted the Sheriff that there continued to be widespread delays in scheduling urgent HSRFs, given evidence that Clay, two related-case Plaintiffs, and other Division 6 detainees with urgent toothaches grieved the excessive wait times they faced in obtaining a dentist appointment. (DRPSF ¶¶ 46, 113, 123, 125; DRPSAF ¶ 32.)

In sum, the Court concludes that there is sufficient evidence from which a reasonable jury could conclude that the Sheriff had notice of systemic issues at the Division 6 dental clinic that prevented detainees from receiving timely dental care for their urgent complaints of pain. But even as the Division 6 dental clinic continued to experience difficulties in promptly scheduling urgent HSRFs, the Sheriff decided to stop tracking data bearing on the timeliness of care once the DOJ stopped its monitoring. And the evidence for the period following the end of DOJ's

monitoring tends to show that Division 6 detainees with urgent complaints of pain and noted dental diagnoses waited weeks before they first visited with a dentist. Considering Clay's evidence as a whole, the Court finds that there is a fact issue for trial as to the Sheriff's deliberate indifference.

### 3. Classwide Injury

Finally, the Court rejects Defendants' contention that Clay's evidence fails to create a genuine dispute of fact as to whether the alleged systemic deficiencies in staffing and scheduling injured the class as a whole. First, Defendants' argument on this point hinges on its unsuccessful effort to exclude the expert opinions of Dr. Lockhart regarding classwide harm. Having found Dr. Lockhart's opinions admissible, her review of the cases of Plaintiffs and exemplars support Clay's claim that systemic deficiencies at the Division 6 dental clinic resulted in delays in care for the entire class. And the Seventh Circuit has found that "a systemic challenge" to "a uniform policy that applies to every detainee at the [Cook County] Jail" and that "causes systemic treatment delays for detainees" in need of dental care can be resolved on a classwide basis. *Scott*, 99 F.4th at 1090.

### III. Defendants' Motion to Decertify Class

This Court certified a plaintiff class pursuant to Federal Rule of Civil Procedure 23(b)(3) after determining that questions of law and fact common to class members predominated over questions affecting only individual members and that a class action was the superior method for adjudicating the claims challenging the constitutional adequacy of the Division 6 dental clinic's care. Having now finished discovery, Defendants contend that the complete record demonstrates that the Court erred in finding that common questions predominated over individual issues and therefore request that the class be decertified. Under Rule 23(c)(1)(C), "[a]n order that grants or denies class certification may be altered or amended before final judgment." Thus, even "[a]fter

37

granting certification, the court remains under a continuing obligation to review whether proceeding as a class is appropriate." *Pietrzycki v. Heights Tower Serv., Inc.*, 290 F. Supp. 3d 822, 831 (N.D. Ill. 2017).

In seeking decertification, Defendants ask that this Court revisit its finding that Clay satisfied Rule 23(b)(3)'s predominance requirement. The Rule 23(b)(3) predominance "'inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy,' with the purpose being to determine whether a proposed class is 'sufficiently cohesive to warrant adjudication by representation.'" *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). The requirement will be satisfied "when common questions represent a significant aspect of a case and can be resolved for all members of a class in a single adjudication." *Id.* at 815 (internal quotation marks omitted). Put differently, "common questions can predominate if a common nucleus of operative facts and issues underlies the claims brought by the proposed class." *Id.* (internal quotation marks omitted).

When the Court originally certified the class, it determined that the evidence as to whether the alleged systemic deficiencies in staffing and scheduling at the Division 6 dental clinic resulted in delays in dental treatment for Division 6 detainees was common to all class members. *Clay*, 2021 WL 4264244, at *8. It further found that a determination as to the constitutionality of those policies was a significant aspect of the case that can be resolved for all class members in a single adjudication. The Court believes that the record continues to support those conclusions. But, as discussed above, the first step in a *Monell* claim requires proving the underlying constitutional violation—here, that Division 6 detainees experienced objectively unreasonable delays in treatment for their urgent dental pain. And Defendants argue that

38

individual questions as to whether any particular class member suffered an injury caused by Defendants' staffing and scheduling policies are so dependent on a class member's particular circumstances that they will overwhelm the common questions in this litigation.

Defendants raised the same predominance concerns in unsuccessfully opposing class certification in the first instance. While this Court acknowledged that "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment," it observed that the Seventh Circuit had suggested "that a class action could likely be maintained based on 'a policy that regularly and systemically impeded timely examinations.'" *Clay*, 2021 WL 4264244, at *9 (quoting *Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 555, 557 (7th Cir. 2016)). Clay alleges two such policies in this case and has now demonstrated that there are questions of fact regarding them. Moreover, when it deemed predominance satisfied, the Court observed that the class definition "limit[ed] the salience of individual variances between its members" by "focus[ing] only on the subset of Division 6 [detainees] whose pain level and delay in treatment were so substantial that there is a realistic possibility that the entire class could be found to have experienced an objectively unreasonable delay in treatment, regardless of their individual differences." *Id.*; *see also Scott*, 99 F.4th at 1090 (observing that "the proposed class in this case is narrowly defined to limit the effect of any variation between its members").

Most of Defendants' arguments for decertifying the class rely on the opinions and analysis of Dr. Dovgan. Because the Court has now barred Dr. Dovgan's opinions, they cannot supply a basis for decertifying the class. Nor is the Court convinced by Defendants' overarching contention that individualized questions about whether each class member suffered from an objectively serious medical condition and experienced an objectively unreasonable delay in treatment preclude class certification. Since the Court certified the class, the Seventh Circuit has

39

made clear that there is a distinction "between challenges to confinement conditions that allege gross and systemic deficiencies (which may proceed on a classwide basis) and those that allege individual claims of inadequate medical care (which may not)." *Scott*, 99 F.4th at 1090. For systemic challenges like that here, "the fact that medical care is inherently individualized" is not by itself "enough to preclude class certification." *Id.* at 1091. Nor is the potential that "class members would need to proceed in individualized trials to prove causation and to seek damages." *Id.* at 1092. As the Seventh Circuit explained:

> If the district court were to determine on the merits that the [challenged municipal policy] passes muster, then all the class members' claims would fail together. If the plaintiffs prevail on the common issue, it will not need to be revisited in each individual proceeding. That is enough to show predominance and superiority.

*Id.* at 1092–93. That analysis controls here. "The gravamen of [Clay's] claim is that a 14-day delay is objectively unreasonable for any inmate complaining of [urgent] pain regardless of their varying individual circumstances." *Clay*, 2021 WL 4264244, at *9. If it is unlawful to make detainees who submit HSRFs complaining of pain of at least 6 out of 10 wait 14 days or more for a dental appointment, then the delay is unlawful as to all class members even though some members may have been more or less deprived than others. *See Dunn v. City of Chicago*, 231 F.R.D. 367, 378 (N.D. Ill. 2005) ("That some detainees may have been more or less deprived . . . does not impede the court's ability to adjudicate whether the shared deprivations suffered by all members of [the class] violated the Constitution.").

At bottom, Defendants' arguments for decertification tend to implicate the merits of Clay's *Monell* claim rather than the propriety of class certification. In particular, Defendants highlight the following difficulties in establishing the class's claim. First, not all detainees who submit an HSRF complaining of urgent pain will be found to have an objectively serious dental condition; many malinger. But whether a detainee was scheduled to see a dentist in an

objectively reasonable amount of time turns on the seriousness of his condition. Moreover, sometimes a detainee will have been timely scheduled for an appointment but then refused to go or could not go due to a conflict such as a court date. Thus, Defendants assert that proving Defendants' liability as to each class member requires looking beyond the information contained in an HSRF and conducting individualized assessments of each class member's medical records to confirm that he had an objectively serious dental condition, that his condition was capable of causing pain at the indicated level of severity, and that he was not himself at fault for any delay in care. But if the evidence establishes that a substantial number of class members misrepresented the severity of their pain or skipped their scheduled appointments, then that likely means that there was no policy causing systemic delays in treatment and the class members' claims fall as one. *See Messner*, 669 F.3d at 824 ("[I]f a proposed class consists largely (or entirely, for that matter) of members who are ultimately shown to have suffered no harm, that may not mean that the class was improperly certified but only that the class failed to meet its burden of proof on the merits."). In any case, none of Defendants' concerns about the need for individualized proof is new. As the Court explained when it certified the class, the need for each individual class member to present individual proof that he "suffered from a sufficiently serious condition in order to establish a constitutional violation" does not, without more, preclude class certification. *Clay*, 2021 WL 4264244, at *9 (quoting *Whitney v. Khan*, 330 F.R.D. 172, 179 (N.D. Ill. 2019)).

Based on its consideration of the complete, post-discovery record, the Court reaffirms its earlier ruling that the common questions as to whether there were systemic deficiencies at the Division 6 dental clinic that caused objectively unreasonable delays in treatment for the class predominate over questions individual to its members. Because they raise no other reason for

42

why the case should not continue as a class action, Defendants' motion to decertify the class is denied.

## CONCLUSION

For the foregoing reasons, Clay's motion to exclude the expert testimony of Dr. Dovgan (Dkt. No. 331) is granted, but Defendants' motion to bar the expert testimony of Dr. Lockhart (Dkt. No. 334) is denied. In addition, Clay's and Defendants' respective motions for summary judgment (Dkt. Nos. 340, 343) are both denied. And finally, Defendants' motion to decertify the class (Dkt. No. 349) is denied.

ENTERED:

Dated: March 26, 2026

_____
Andrea R. Wood
United States District Judge